# GUINN AND BEAL v. UNITED STATES.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR
THE EIGHTH CIRCUIT.

No. 96.   Argued October 17, 1913.—Decided June 21, 1915.

The so-called Grandfather Clause of the amendment to the constitu-
tion of Oklahoma of 1910 is void because it violates the Fifteenth
Amendment to the Constitution of the United States.

The Grandfather Clause being unconstitutional and not being separable
from the remainder of the amendment to the constitution of Okla-
homa of 1910, that amendment as a whole is invalid.

The Fifteenth Amendment does not, in a general sense, take from the
States the power over suffrage possessed by the States from the be-
ginning, but it does restrict the power of the United States or the
States to abridge or deny the right of a citizen of the United States
to vote on account of race, color or previous condition of servitude.

While the Fifteenth Amendment gives no right of suffrage, as its com-
mand is self-executing, rights of suffrage may be enjoyed by reason
of the striking out of discriminations against the exercise of the
right.

A provision in a state constitution recurring to conditions existing be-
fore the adoption of the Fifteenth Amendment and the continuance
of which conditions that amendment prohibited, and making those

conditions the test of the right to the suffrage is in conflict with, and void under, the Fifteenth Amendment.

The establishment of a literacy test for exercising the suffrage is an exercise by the State of a lawful power vested in it not subject to the supervision of the Federal courts.

Whether a provision in a suffrage statute may be valid under the Federal Constitution, if it is so connected with other provisions that are invalid, as to make the whole statute unconstitutional, is a question of state law, but in the absence of any decision by the state court, this court may, in a case coming from the Federal courts, determine it for itself.

The suffrage and literacy tests in the amendment of 1910 to the constitution of Oklahoma are so connected with each other that the unconstitutionality of the former renders the whole amendment invalid.

THE facts, which involve the constitutionality under the Fifteenth Amendment of the Constitution of the United States of the suffrage amendment to the constitution of Oklahoma, known as the Grandfather Clause, and the responsibility of election officers under § 5508, Rev. Stat., and § 19 of the Penal Code for preventing people from voting who have the right to vote, are stated in the opinion.

*Mr. Joseph W. Bailey,* with whom *Mr. C. B. Stuart, Mr. A. C. Cruce, Mr. W. A. Ledbetter, Mr. Norman Haskell* and *Mr. C. G. Hornor* were on the brief, for plaintiffs in error:

Determination of the constitutionality of the Grandfather Clause in the Oklahoma constitution, not being necessary to a full solution of this case, this court will not pass upon the constitutionality of such provision. *Atwater* v. *Hassett,* 111 Pac. Rep. 802; Bishop on Stat. Crime, §§ 805–806; *Braxton County* v. *West Virginia,* 208 U. S. 192; *Burns* v. *State,* 12 Wisconsin, 519; *Devard* v. *Hoffman,* 18 Maryland, 479; *Liverpool Co.* v. *Immigration Commissioners,* 113 U. S. 39; *Mo., Kans. & Tex. Ry.* v. *Ferris,* 179 U. S. 606; §§ 19, 20, Penal Code; § 5508,

Rev. Stats. (§ 19, Penal Code); *Smith* v. *Indiana*, 191 U. S. 139; *Cruce* v. *Cease*, 114 Pac. Rep. 251; *New Orleans Canal Co.* v. *Heard*, 47 La. Ann. 1679.

As to the nature of suffrage, see Jameson on Const. Conventions, § 336.

Suffrage in the States of the American Union is not controlled or affected by the Fourteenth Amendment to the Constitution of the United States. Blaine's Twenty Years in Congress; Brannon's Fourteenth Amendment, 77; *Coffield* v. *Coryell*, 4 Wash. C. C. 371; Miller's Lectures on Const., 661; *Minor* v. *Happersett*, 21 Wall. 162; *Slaughter House Cases*, 16 Wall. 36; *Strauder* v. *West Virginia*, 100 U. S. 303; 1 Willoughby's Constitution, 534; 2 *Id.* 483; 5 Woodrow Wilson's Hist. Am. People.

The Grandfather Clause does not violate the Fifteenth Amendment to the Constitution of the United States. *Atwater* v. *Hassett*, 111 Pac. Rep. 802; *Dred Scott Case*, 19 How. 393; *Dodge* v. *Woolsey*, 18 How. 371; *Fairbanks* v. *United States*, 181 U. S. 286; *Fletcher* v. *Peck*, 6 Cranch, 87; *Mills* v. *Green*, 67 Fed. Rep. 818; *Mills* v. *Green*, 69 Fed. Rep. 852; *Mitchell* v. *Lippencott*, 2 Woods, 372; *McClure* v. *Owen*, 26 Iowa, 253; *McCreary* v. *United States*, 195 U. S. 27; *Pope* v. *Williams*, 193 U. S. 621; *Southern R. R.* v. *Orton*, 6 Sawyer, 32 Fed. Rep. 478; *State* v. *Grand Trunk R. R.*, 3 Fed. Rep. 889; Stimson's Fed. & State Const. 224; *United States* v. *Reece*, 92 U. S. 214; *United States* v. *Cruickshank*, 92 U. S. 542; *United States* v. *Anthony*, 11 Blatchf. 205; *United States* v. *Des Moines*, 142 U. S. 545; *Webster* v. *Cooper*, 14 How. 488; *Williams* v. *Mississippi*, 170 U. S. 214; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

Even though the exemption privilege provided in the Grandfather Law may be invalid, yet, the body of the law may be permitted to stand. *Albany* v. *Stanley*, 105 U. S. 305; *Trade Mark Cases*, 100 U. S. 82; *Little Rock &c. Ry.* v. *Worthen*, 120 U. S. 97.

The exception does not deny or abridge the right to vote on account of race, color, or previous condition of servitude.

The purpose and motive which moved the legislature to submit and the people to adopt the amendment are not subject to judicial inquiry.

The exception which is challenged as vitiating the entire amendment, even if open to judicial inquiry, is valid, because it applies without distinction of race, color, or previous condition of servitude.

In support of these contentions, see *Bailey* v. *Alabama*, 219 U. S. 219; *Cruce* v. *Cease*, 28 Oklahoma, 271; *Home Ins. Co.* v. *New York*, 134 U. S. 594; *McCray* v. *United States*, 195 U. S. 27; *Ratcliffe* v. *Beal*, 20 So. Rep. 865; *Smith* v. *Indiana*, 191 U. S. 138; *Soon Hing* v. *Crowley*, 113 U. S. 703; *United States* v. *Reese*, 92 U. S. 214; *Williams* v. *Mississippi*, 170 U. S. 213; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

*Mr. Solicitor General Davis* for the United States:

The questions propounded by the Circuit Court of Appeals are raised by the facts as certified and are indispensable to a determination of the cause.

The answer to the second question propounded by the court, is that the Grandfather Clause of the amendment to the constitution of Oklahoma of the year 1910 is void because it violates the Fifteenth Amendment.

The so-called Grandfather Clause incorporates by reference the laws of those States which in terms excluded negroes from the franchise on January 1, 1866, because of race, color, or condition of servitude, and so itself impliedly excludes them for the same reason.

The doctrine of incorporation by reference has been frequently enunciated and applied. *Bank for Savings* v. *Collector*, 3 Wall. 495; *Donnelly* v. *United States*, 228 U. S. 243; *Ex parte Crow Dog*, 109 U. S. 556; *In re Heath*,

144 U. S. 92; *In re Hohorst*, 150 U. S. 653; *United States* v. *Le Bris*, 121 U. S. 278; *Viterbo* v. *Friedlander*, 120 U. S. 707. See also: Endlich, Interp. Stats., § 492; Potter's Dwarris, pp. 190–192, 218; Sutherland, Statutes, 2d ed., § 405.

What is implied in a statute is as much a part of it as what is expressed. *Gelpcke* v. *Dubuque*, 1 Wall. 175, 220; *United States* v. *Babbit*, 1 Black, 55, 61; *Wilson County* v. *Third Nat. Bank*, 103 U. S. 770, 778.

Whether at a given time a man was entitled to vote is a mixed question of law and fact, to be resolved only by consulting the law fixing the qualifications for suffrage and then the facts as to his possession of those qualifications.

While the Fifteenth Amendment did not confer the right of suffrage upon anyone, it did confer upon citizens of the United States from and after the date of its ratification the right not to be discriminated against in the exercise of the elective franchise on account of race, color, or previous condition of servitude. *United States* v. *Reese*, 92 U. S. 214; *United States* v. *Cruikshank*, 92 U. S. 542.

In all cases where the former slave-holding States had not removed from their constitutions the word "white" as a qualification for voting, the Fifteenth Amendment did in effect confer upon the negro the right to vote, because, being paramount to the state law, it annulled the discriminating word "white" and thus left him in the enjoyment of the same right as white persons. *Ex parte Yarbrough*, 110 U. S. 651; *Neal* v. *Delaware*, 103 U. S. 370.

If, therefore, the date fixed in the Grandfather Clause had been the year 1871—after the adoption of the Fifteenth Amendment—instead of the year 1866, the constitutions and laws to which it referred, and which were by such reference made a part of it, would have been already purged of the vice of racial discrimination, and

the amendment itself would have been likewise free from it. To reflect upon the change which would be wrought in the meaning of this Grandfather Clause by the substitution of the year 1871 for the year 1866 is to be confirmed in the conviction of its utter invalidity.

The necessary effect and operation of the Grandfather Clause is to exclude practically all illiterate negroes and practically no illiterate white men, and from this its unconstitutional purpose may legitimately be inferred.

The census statistics show that the proportion of negroes qualified under the test imposed by the Grandfather Clause is as inconsiderable as the proportion of whites thereby disqualified.

In practical operation the amendment inevitably discriminates between the class of illiterate whites and illiterate blacks as a class, to the overwhelming disadvantage of the latter.

The necessary effect and operation of a state statute or constitutional amendment may be considered in determining its validity under the Federal Constitution. *Bailey* v. *Alabama,* 219 U. S. 219; *Ho Ah Kow* v. *Nunan,* 5 Sawyer, 552; *Home Insurance Co.* v. *New York,* 134 U. S. 594, 598; *Yick Wo* v. *Hopkins,* 118 U. S. 356. See also: *Brimmer* v. *Rebman,* 138 U. S. 78, 82; *Chy Lung* v. *Freeman,* 92 U. S. 275, 278; *Dobbins* v. *Los Angeles,* 195 U. S. 223, 240; *Henderson* v. *Mayor of N. Y.,* 92 U. S. 259, 268; *Lochner* v. *New York,* 198 U. S. 45, 64; *McCray* v. *United States,* 195 U. S. 27, 60. See also: *Maxwell* v. *Dow,* 176 U. S. 581; *Minnesota* v. *Barber,* 136 U. S. 313, 319; *Missouri* v. *Lewis,* 101 U. S. 22, 32; *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 63. Distinguishing—*Barbier* v. *Connolly,* 113 U. S. 27; *Soon Hing* v. *Crowley,* 113 U. S. 703; and *Williams* v. *Mississippi,* 170 U. S. 213.

The answer to the first question propounded by the court is that the Grandfather Clause being in violation of the Fifteenth Amendment and void, the amendment of 1910

GUINN v. UNITED STATES.           353

238 U. S.   Argument for National Asso. for Adv. of Colored People.

to the constitution of Oklahoma as a whole is likewise invalid. The unconstitutional portion of the amendment is not separable from the remainder. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 564–565; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 395.

The first question certified by the Circuit Court of Appeals should be answered in the negative; the second question in the affirmative.

*Mr. Moorfield Storey* for the National Association for the Advancement of Colored People:

All discriminations respecting the right to vote on account of color are unconstitutional.

Whether the Oklahoma amendment constitutes such a discrimination is to be determined by its purpose and effect, and not by its phraseology alone.

The undoubted purpose and effect of the amendment is to discriminate against colored voters. *Anderson* v. *Myers*, 182 Fed. Rep. 223; *Bailey* v. *Alabama*, 219 U. S. 219; *Brimmer* v. *Rebman*, 138 U. S. 78; *Collins* v. *New Hampshire*, 171 U. S. 30; *Chy Lung* v. *Freeman*, 92 U. S. 275; *Galveston &c. Ry.* v. *Texas*, 210 U. S. 217; *Giles* v. *Harris*, 189 U. S. 475; *Giles* v. *Teasley*, 193 U. S. 146; *Graver* v. *Faurot*, 162 U. S. 435; *Hannibal & St. Jo. R. R.* v. *Husen*, 95 U. S. 465; *Henderson* v. *Mayor of New York*, 92 U. S. 259; *Lochner* v. *New York*, 198 U. S. 45; *Maynard* v. *Hecht*, 151 U. S. 324; *Minnesota* v. *Barber*, 136 U. S. 313; *Mobile* v. *Watson*, 116 U. S. 289; *New Hampshire* v. *Louisiana*, 108 U. S. 76; *People* v. *Albertson*, 55 N. Y. 50; *People* v. *Compagnie Générale*, 107 U. S. 59; *Postal Tel.-Cable* v. *Taylor*, 192 U. S. 64; *Schollenberger* v. *Pennsylvania*, 171 U. S. 1; *Scott* v. *Donald*, 165 U. S. 58; *Smith* v. *St. Louis & So. W. Ry.*, 181 U. S. 248; *State* v. *Jones*, 66 Ohio St. 453; *Strauder* v. *West Virginia*, 100 U. S. 303; *Voight* v. *Wright*, 141 U. S. 62; *Williams* v. *Mississippi*, 170 U. S. 213; *Ex parte Yarbrough*, 110 U. S. 651.

*Mr. J. H. Adriaans* filed a brief as *amicus curiæ.*

*Mr. John H. Burford* and *Mr. John Embry* filed a brief as *amici curiæ.*

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

This case is before us on a certificate drawn by the court below as the basis of two questions which are submitted for our solution in order to enable the court correctly to decide issues in a case which it has under consideration. Those issues arose from an indictment and conviction of certain election officers of the State of Oklahoma (the plaintiffs in error) of the crime of having conspired unlawfully, wilfully and fraudulently to deprive certain negro citizens, on account of their race and color, of a right to vote at a general election held in that State in 1910, they being entitled to vote under the state law and which right was secured to them by the Fifteenth Amendment to the Constitution of the United States. The prosecution was directly concerned with § 5508, Rev. Stat., now § 19 of the Penal Code which is as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

We concentrate and state from the certificate only matters which we deem essential to dispose of the questions asked.

Suffrage in Oklahoma was regulated by § 1, Article III of the Constitution under which the State was admitted into the Union.  Shortly after the admission there was submitted an amendment to the Constitution making a radical change in that article which was adopted prior to November 8, 1910.  At an election for members of Congress which followed the adoption of this Amendment certain election officers in enforcing its provisions refused to allow certain negro citizens to vote who were clearly entitled to vote under the provision of the Constitution under which the State was admitted, that is, before the amendment, and who, it is equally clear, were not entitled to vote under the provision of the suffrage amendment if that amendment governed.  The persons so excluded based their claim of right to vote upon the original Constitution and upon the assertion that the suffrage amendment was void because in conflict with the prohibitions of the Fifteenth Amendment and therefore afforded no basis for denying them the right guaranteed and protected by that Amendment.  And upon the assumption that this claim was justified and that the election officers had violated the Fifteenth Amendment in denying the right to vote, this prosecution, as we have said, was commenced. At the trial the court instructed that by the Fifteenth Amendment the States were prohibited from discriminating as to suffrage because of race, color, or previous condition of servitude and that Congress in pursuance of the authority which was conferred upon it by the very terms of the Amendment to enforce its provisions had enacted the following (Rev. Stat., § 2004):

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people of any State, Territory, district, . . . municipality, . . . or

other territorial subdivision, shall be entitled and allowed
to vote at all such elections, without distinction of race,
color, or previous condition of servitude; any constitu-
tion, law, custom, usage, or regulation of any State or
Territory, or by or under its authority, to the contrary
notwithstanding."

It then instructed as follows:

"The State amendment which imposes the test of read-
ing and writing any section of the State constitution as a
condition to voting to persons not on or prior to January 1,
1866, entitled to vote under some form of government, or
then resident in some foreign nation, or a lineal descendant
of such person, is not valid, but you may consider it in so
far as it was in good faith relied and acted upon by the
defendants in ascertaining their intent and motive.  If
you believe from the evidence that the defendants formed
a common design and coöperated in denying the colored
voters of Union Township precinct, or any of them, en-
titled to vote, the privilege of voting, but this was due to a
mistaken belief sincerely entertained by the defendants
as to the qualifications of the voters—that is, if the motive
actuating the defendants was honest, and they simply
erred in the conception of their duty—then the criminal
intent requisite to their guilt is wanting and they cannot be
convicted.  On the other hand, if they knew or believed
these colored persons were entitled to vote, and their pur-
pose was to unfairly and fraudulently deny the right of
suffrage to them, or any of them entitled thereto, on ac-
count of their race and color, then their purpose was a
corrupt one, and they cannot be shielded by their official
positions."

The questions which the court below asks are these:

"1. Was the amendment to the constitution of Okla-
homa, heretofore set forth, valid?

"2. Was that amendment void in so far as it attempted
to debar from the right or privilege of voting for a qualified

candidate for a Member of Congress in Oklahoma, unless they were able to read and write any section of the constitution of Oklahoma, negro citizens of the United States who were otherwise qualified to vote for a qualified candidate for a Member of Congress in that State, but who were not, and none of whose lineal ancestors was, entitled to vote under any form of government on January 1, 1866, or at any time prior thereto, because they were then slaves?"

As these questions obviously relate to the provisions concerning suffrage in the original constitution and the amendment to those provisions which forms the basis of the controversy, we state the text of both. The original clause so far as material was this:

"The qualified electors of the State shall be male citizens of the United States, male citizens of the State, and male-persons of Indian descent native of the United States, who are over the age of twenty-one years, who have resided in the State one year, in the county six months, and in the election precinct thirty days, next preceding the election at which any such elector offers to vote."

And this is the amendment:

"No person shall be registered as an elector of this State or be allowed to vote in any election herein, unless he be able to read and write any section of the constitution of the State of Oklahoma; but no person who was, on January 1, 1866, or at any time prior thereto, entitled to vote under any form of government, or who at that time resided in some foreign nation, and no lineal descendant of such person, shall be denied the right to register and vote because of his inability to so read and write sections of such constitution. Precinct election inspectors having in charge the registration of electors shall enforce the provisions of this section at the time of registration, provided registration be required. Should registration be dispensed with, the provisions of this section shall be enforced by the

precinct election officer when electors apply for ballots to vote."

Considering the questions in the light of the text of the suffrage amendment it is apparent that they are twofold because of the twofold character of the provisions as to suffrage which the amendment contains. The first question is concerned with that provision of the amendment which fixes a standard by which the right to vote is given upon conditions existing on January 1, 1866, and relieves those coming within that standard from the standard based on a literacy test which is established by the other provision of the amendment. The second question asks as to the validity of the literacy test and how far, if intrinsically valid, it would continue to exist and be operative in the event the standard based upon January 1, 1866, should be held to be illegal as violative of the Fifteenth Amendment.

To avoid that which is unnecessary let us at once consider and sift the propositions of the United States on the one hand and of the plaintiffs in error on the other, in order to reach with precision the real and final question to be considered. The United States insists that the provision of the amendment which fixes a standard based upon January 1, 1866, is repugnant to the prohibitions of the Fifteenth Amendment because in substance and effect that provision, if not an express, is certainly an open repudiation of the Fifteenth Amendment and hence the provision in question was stricken with nullity in its inception by the self-operative force of the Amendment, and as the result of the same power was at all subsequent times devoid of any vitality whatever.

For the plaintiffs in error on the other hand it is said the States have the power to fix standards for suffrage and that power was not taken away by the Fifteenth Amendment but only limited to the extent of the prohibitions which that Amendment established. This being true, as the

standard fixed does not in terms make any discrimination on account of race, color, or previous condition of servitude, since all, whether negro or white, who come within its requirements enjoy the privilege of voting, there is no ground upon which to rest the contention that the provision violates the Fifteenth Amendment. This, it is insisted, must be the case unless it is intended to expressly deny the State's right to provide a standard for suffrage, or what is equivalent thereto, to assert: *a*, that the judgment of the State exercised in the exertion of that power is subject to Federal judicial review or supervision, or *b*, that it may be questioned and be brought within the prohibitions of the Amendment by attributing to the legislative authority an occult motive to violate the Amendment or by assuming that an exercise of the otherwise lawful power may be invalidated because of conclusions concerning its operation in practical execution and resulting discrimination arising therefrom, albeit such discrimination was not expressed in the standard fixed or fairly to be implied but simply arose from inequalities naturally inhering in those who must come within the standard in order to enjoy the right to vote.

On the other hand the United States denies the relevancy of these contentions. It says state power to provide for suffrage is not disputed, although, of course, the authority of the Fifteenth Amendment and the limit on that power which it imposes is insisted upon. Hence, no assertion denying the right of a State to exert judgment and discretion in fixing the qualification of suffrage is advanced and no right to question the motive of the State in establishing a standard as to such subjects under such circumstances or to review or supervise the same is relied upon and no power to destroy an otherwise valid exertion of authority upon the mere ultimate operation of the power exercised is asserted. And applying these principles to the very case in hand the argument of the

Government in substance says: No question is raised by the Government concerning the validity of the literacy test provided for in the amendment under consideration as an independent standard since the conclusion is plain that that test rests on the exercise of state judgment and therefore cannot be here assailed either by disregarding the State's power to judge on the subject or by testing its motive in enacting the provision. The real question involved, so the argument of the Government insists, is the repugnancy of the standard which the amendment makes, based upon the conditions existing on January 1, 1866, because on its face and inherently considering the substance of things, that standard is a mere denial of the restrictions imposed by the prohibitions of the Fifteenth Amendment and by necessary result re-creates and perpetuates the very conditions which the Amendment was intended to destroy. From this it is urged that no legitimate discretion could have entered into the fixing of such standard which involved only the determination to directly set at naught or by indirection avoid the commands of the Amendment. And it is insisted that nothing contrary to these propositions is involved in the contention of the Government that if the standard which the suffrage amendment fixes based upon the conditions existing on January 1, 1866, be found to be void for the reasons urged, the other and literacy test is also void, since that contention rests, not upon any assertion on the part of the Government of any abstract repugnancy of the literacy test to the prohibitions of the Fifteenth Amendment, but upon the relation between that test and the other as formulated in the suffrage amendment and the inevitable result which it is deemed must follow from holding it to be void if the other is so declared to be.

Looking comprehensively at these contentions of the parties it plainly results that the conflict between them is

much narrower than it would seem to be because the premise which the arguments of the plaintiffs in error attribute to the propositions of the United States is by it denied. On the very face of things it is clear that the United States disclaims the gloss put upon its contentions by limiting them to the propositions which we have hitherto pointed out, since it rests the contentions which it makes as to the assailed provision of the suffrage amendment solely upon the ground that it involves an unmistakable, although it may be a somewhat disguised, refusal to give effect to the prohibitions of the Fifteenth Amendment by creating a standard which it is repeated but calls to life the very conditions which that Amendment was adopted to destroy and which it had destroyed.

The questions then are: (1) Giving to the propositions of the Government the interpretation which the Government puts upon them and assuming that the suffrage provision has the significance which the Government assumes it to have, is that provision as a matter of law repugnant to the Fifteenth Amendment? which leads us of course to consider the operation and effect of the Fifteenth Amendment. (2) If yes, has the assailed amendment in so far as it fixes a standard for voting as of January 1, 1866, the meaning which the Government attributes to it? which leads us to analyze and interpret that provision of the amendment. (3) If the investigation as to the two prior subjects establishes that the standard fixed as of January 1, 1866, is void, what if any effect does that conclusion have upon the literacy standard otherwise established by the amendment? which involves determining whether that standard, if legal, may survive the recognition of the fact that the other or 1866 standard has not and never had any legal existence. Let us consider these subjects under separate headings.

1. *The operation and effect of the Fifteenth Amendment.* This is its text:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

"Section 2. The Congress shall have power to enforce this article by appropriate legislation."

(a) Beyond doubt the Amendment does not take away from the state governments in a general sense the power over suffrage which has belonged to those governments from the beginning and without the possession of which power the whole fabric upon which the division of state and national authority under the Constitution and the organization of both governments rest would be without support and both the authority of the nation and the State would fall to the ground. In fact, the very command of the Amendment recognizes the possession of the general power by the State, since the Amendment seeks to regulate its exercise as to the particular subject with which it deals.

(b) But it is equally beyond the possibility of question that the Amendment in express terms restricts the power of the United States or the States to abridge or deny the right of a citizen of the United States to vote on account of race, color or previous condition of servitude. The restriction is coincident with the power and prevents its exertion in disregard of the command of the Amendment. But while this is true, it is true also that the Amendment does not change, modify or deprive the States of their full power as to suffrage except of course as to the subject with which the Amendment deals and to the extent that obedience to its command is necessary. Thus the authority over suffrage which the States possess and the limitation which the Amendment imposes are coördinate and one may not destroy the other without bringing about the destruction of both.

(c) While in the true sense, therefore, the Amendment

gives no right of suffrage, it was long ago recognized that in operation its prohibition might measurably have that effect; that is to say, that as the command of the Amendment was self-executing and reached without legislative action the conditions of discrimination against which it was aimed, the result might arise that as a consequence of the striking down of a discriminating clause a right of suffrage would be enjoyed by reason of the generic character of the provision which would remain after the discrimination was stricken out. *Ex parte Yarbrough*, 110 U. S. 651; *Neal* v. *Delaware*, 103 U. S. 370. A familiar illustration of this doctrine resulted from the effect of the adoption of the Amendment on state constitutions in which at the time of the adoption of the Amendment the right of suffrage was conferred on all white male citizens, since by the inherent power of the Amendment the word white disappeared and therefore all male citizens without discrimination on account of race, color or previous condition of servitude came under the generic grant of suffrage made by the State.

With these principles before us how can there be room for any serious dispute concerning the repugnancy of the standard based upon January 1, 1866 (a date which preceded the adoption of the Fifteenth Amendment), if the suffrage provision fixing that standard is susceptible of the significance which the Government attributes to it? Indeed, there seems no escape from the conclusion that to hold that there was even possibility for dispute on the subject would be but to declare that the Fifteenth Amendment not only had not the self-executing power which it has been recognized to have from the beginning, but that its provisions were wholly inoperative because susceptible of being rendered inapplicable by mere forms of expression embodying no exercise of judgment and resting upon no discernible reason other than the purpose to disregard the prohibitions of the Amendment by creating a standard of

voting which on its face was in substance but a revitalization of conditions which when they prevailed in the past had been destroyed by the self-operative force of the Amendment.

2. *The standard of January 1, 1866, fixed in the suffrage amendment and its significance.*

The inquiry of course here is, Does the amendment as to the particular standard which this heading embraces involve the mere refusal to comply with the commands of the Fifteenth Amendment as previously stated? This leads us for the purpose of the analysis to recur to the text of the suffrage amendment. Its opening sentence fixes the literacy standard which is all-inclusive since it is general in its expression and contains no word of discrimination on account of race or color or any other reason. This however is immediately followed by the provisions creating the standard based upon the condition existing on January 1, 1866, and carving out those coming under that standard from the inclusion in the literacy test which would have controlled them but for the exclusion thus expressly provided for. The provision is this:

"But no person who was, on January 1, 1866, or at any time prior thereto, entitled to vote under any form of government, or who at that time resided in some foreign nation, and no lineal descendant of such person, shall be denied the right to register and vote because of his inability to so read and write sections of such constitution."

We have difficulty in finding words to more clearly demonstrate the conviction we entertain that this standard has the characteristics which the Government attributes to it than does the mere statement of the text. It is true it contains no express words of an exclusion from the standard which it establishes of any person on account of race, color, or previous condition of servitude prohibited by the Fifteenth Amendment, but the standard itself inherently brings that result into existence since it is based

purely upon a period of time before the enactment of the Fifteenth Amendment and makes that period the controlling and dominant test of the right of suffrage. In other words, we seek in vain for any ground which would sustain any other interpretation but that the provision, recurring to the conditions existing before the Fifteenth Amendment was adopted and the continuance of which the Fifteenth Amendment prohibited, proposed by in substance and effect lifting those conditions over to a period of time after the Amendment to make them the basis of the right to suffrage conferred in direct and positive disregard of the Fifteenth Amendment: And the same result, we are of opinion, is demonstrated by considering whether it is possible to discover any basis of reason for the standard thus fixed other than the purpose above stated. We say this because we are unable to discover how, unless the prohibitions of the Fifteenth Amendment were considered, the slightest reason was afforded for basing the classification upon a period of time prior to the Fifteenth Amendment. Certainly it cannot be said that there was any peculiar necromancy in the time named which engendered attributes affecting the qualification to vote which would not exist at another and different period unless the Fifteenth Amendment was in view.

While these considerations establish that the standard fixed on the basis of the 1866 test is void, they do not enable us to reply even to the first question asked by the court below, since to do so we must consider the literacy standard established by the suffrage amendment and the possibility of its surviving the determination of the fact that the 1866 standard never took life since it was void from the beginning because of the operation upon it of the prohibitions of the Fifteenth Amendment. And this brings us to the last heading:

3. *The determination of the validity of the literacy test and the possibility of its surviving the disappearance of the 1866*

*standard with which it is associated in the suffrage amendment.*

No time need be spent on the question of the validity of the literacy test considered alone since as we have seen its establishment was but the exercise by the State of a lawful power vested in it not subject to our supervision, and indeed, its validity is admitted.. Whether this test is so connected with the other one relating to the situation on January 1, 1866, that the invalidity of the latter requires the rejection of the former is really a question of state law, but in the absence of any decision on the subject by the Supreme Court of the State, we must determine it for ourselves. We are of opinion that neither forms of classification nor methods of enumeration should be made the basis of striking down a provision which was independently legal and therefore was lawfully enacted because of the removal of an illegal provision with which the legal provision or provisions may have been associated. We state what we hold to be the rule thus strongly because we are of opinion that on a subject like the one under consideration involving the establishment of a right whose exercise lies at the very basis of government a much more exacting standard is required than would ordinarily obtain where the influence of the declared unconstitutionality of one provision of a statute upon another and constitutional provision is required to be fixed. Of course, rigorous as is this rule and imperative as is the duty not to violate it, it does not mean that it applies in a case where it expressly appears that a contrary conclusion must be reached if the plain letter and necessary intendment of the provision under consideration so compels, or where such a result is rendered necessary because to follow the contrary course would give rise to such an extreme and anomalous situation as would cause it to be impossible to conclude that it could have been upon any hypothesis whatever within the mind of the law-making power.

Does the general rule here govern or is the case controlled by one or the other of the exceptional conditions which we have just stated, is then the remaining question to be decided. Coming to solve it we are of opinion that by a consideration of the text of the suffrage amendment in so far as it deals with the literacy test and to the extent that it creates the standard based upon conditions existing on January 1, 1866, the case is taken out of the general rule and brought under the first of the exceptions stated. We say this because in our opinion the very language of the suffrage amendment expresses, not by implication nor by forms of classification nor by the order in which they are made, but by direct and positive language the command that the persons embraced in the 1866 standard should not be under any conditions subjected to the literacy test, a command which would be virtually set at naught if on the obliteration of the one standard by the force of the Fifteenth Amendment the other standard should be held to continue in force.

The reasons previously stated dispose of the case and make it plain that it is our duty to answer the first question, No, and the second, Yes; but before we direct the entry of an order to that effect we come briefly to dispose of an issue the consideration of which we have hitherto postponed from a desire not to break the continuity of discussion as to the general and important subject before us.

In various forms of statement not challenging the instructions given by the trial court concretely considered concerning the liability of the election officers for their official conduct, it is insisted that as in connection with the instructions the jury was charged that the suffrage amendment was unconstitutional because of its repugnancy to the Fifteenth Amendment, therefore taken as a whole the charge was erroneous. But we are of opinion that this contention is without merit, especially in view

of the doctrine long since settled concerning the self-executing power of the Fifteenth Amendment and of what we have held to be the nature and character of the suffrage amendment in question. The contention concerning the inapplicability of § 5508, Rev. Stat., now § 19 of the Penal Code, or of its repeal by implication, is fully answered by the ruling this day made in *United States* v. *Mosley,* No. 180, *post,* p. 383.

We answer the first question, No, and the second question, Yes.

*And it will be so certified.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of this case.