UNITED STATES of America,
Appellee,

v.

Don WESTON, Appellant.

UNITED STATES of America,
Appellee,

v.

Fugate CRUMLEY, Appellant.

UNITED STATES of America,
Appellee,

v.

Woodrow ROBINSON, Appellant.

UNITED STATES of America,
Appellee,

v.

Angus DAVID, Appellant.

UNITED STATES of America,
Appellee,

v.

Edgar KIRK, Appellant.

UNITED STATES of America,
Appellee,

v.

Curtis ROWE and Ruby Rowe,
Appellants.

Nos. 12843-12848.

United States Court of Appeals
Fourth Circuit.

Argued June 12, 1969.

Decided Oct. 16, 1969.

Certiorari Denied Feb. 2, 1970.
See 90 S.Ct. 756.

---

1. 171 N.L.R.B. No. 8.

James P. Jones, Abingdon, Va. (Penn, Stuart & Miller, Abingdon, Va., on brief), for Don Weston.

James C. Roberson, Norton, Va., for Fugate Crumley.

Edgar Bacon, Jonesville, Va., for Woodrow Robinson.

Robert T. Winston, Jr., Norton, Va. (Greear, Bowen, Mullins & Winston,

Norton, Va., on brief), for Angus David and Edgar Kirk.

William B. Hopkins, Roanoke, Va. (James E. Buchholtz and Martin, Hopkins & Lemon, Roanoke, Va., on brief), for Curtis Rowe and Ruby Rowe.

Thomas B. Mason, U. S. Atty., and Robert S. Irons, Asst. U. S. Atty., for appellee.

Before SOBELOFF, WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Appellants were found guilty of violations of 18 U.S.C.A. § 241.[1] The indictment charged that during the congressional elections of November 1966 the defendants knowingly conspired to cause votes to be cast in Lee County, Virginia, in violation of the absentee voting laws of Virginia, resulting in the return and certification of illegal ballots, which, in turn, diminished and diluted the effect of votes legally cast. We have reviewed the appellants' contentions for a new trial, or, in the alternative, for acquittal, and have concluded that the convictions should be affirmed.

## I.

■ Several of the appellants (Weston, Robinson, David and Kirk) contend that the indictment does not state an offense under 18 U.S.C.A. § 241. Collaterally, appellants contend that certain technical deviations from Virginia's statutory voting scheme were immaterial. Be that as it may, we note at the outset that the Virginia election laws are not merely directory, but mandatory. Fields v. United States, 228 F.2d 544, 548 (4th Cir.1955). We conclude that the acts charged to the appellants, and described below, were indictable under § 241.

■ Since Fields v. United States, *supra*, it has been established in this circuit that the procurement of absentee ballots in violation of state election laws is indictable under § 241. See, United States v. Chandler, 157 F.Supp. 753 (S. D.W.Va.1957). The rationale is clear and simple. Since Ex Parte Yarborough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), the Supreme Court has repeatedly held that the right to vote in federal elections is protected by this legislation because it is a right "secured * * * by the Constitution or laws of the United States."[2] The right to vote necessarily includes the right to have one's vote counted and counted at its full worth. United States v. Mosley, 238 U. S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915). Clearly, the acts charged in the indictment tend to frustrate these rights. Absentee ballots not cast in strict compliance with the state law dilute the influence of honest votes cast in obedience to the law. "The action pursuant to the conspiracy here charged constitutes the rendering of a return which, to some extent, falsifies the count of votes legally cast." United States v. Saylor, 322 U.S. 385, 389, 64 S.Ct. 1101, 1103, 88 L.Ed. 1341 (1944), rehearing denied, 323 U.S. 809, 65 S.Ct. 27, 89 L. Ed. 645.[3]

1. The pertinent part of the statute reads, as follows:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same * * *.

> * * * * *

> They shall be fined * * * or imprisoned * * *.

2. United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944), rehearing denied, 323 U.S. 809, 65 S.Ct. 27, 89 L.Ed. 645; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), rehearing denied, 314 U.S. 707, 62 S.Ct. 51, 86 L.Ed. 565; United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915); Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915).

3. Legislative reapportionment cases are instructive on the nature of the right to

## II.

■ Three appellants (Crumley, David and Kirk) contest the sufficiency of the evidence to sustain their convictions. We have reviewed the evidence in the light most favorable to the government and find it sufficient.

Absentee ballots constituted 15.8 percent of the ballots cast in Lee County during the 1966 election. By state law only two categories of voters may cast absentee ballots:

■ Any duly qualified voter who will * * * be absent from the city, town, or from the precinct in which he is entitled to vote, * * * and [2] any such voter who may be physically unable to go in person to the polls on the day of election * * *.

Code of Virginia § 24–319.

Fifty-three of the applications for absentee ballots were witnessed by Fugate Crumley, deputy sheriff of Lee County.[4] Fifty-four of the applications specified that the ballot and voting material were to be mailed to the voter in care of Crumley. At the trial the government produced six witnesses against Crumley.

Of these six three gave testimony tending to show that Crumley and another defendant, Woodrow Robinson, a notary public, worked as a team—Crumley obtaining the application of the voter and the voting materials and returning to the voter with Robinson, who notarized the "voucher" and "coupon" required to be returned with the voted ballot.[5]

■ Tommy Ayers, the first of the three witnesses visited by Crumley and Robinson, was an illiterate. He testified that he did not sign an application for an absentee ballot and that Crumley and Robinson visited his home only once. Code of Virginia § 24–327 contemplates some minimal hiatus between the time the registrar receives the application and the time the voting material is issued by the electoral board, during which time it is determined whether the applicant is registered and qualified to vote.

Elizabeth Cavins, another illiterate, testified that Crumley "came in with some papers and set down in the chair and wrote on some papers and doubled them up and put them back in the envelope, and that is all I know." She stated that on a second occasion Crumley returned with Robinson. She said that

vote, see, e. g., Mr. Justice Douglas' dissent in South v. Peters, 339 U.S. 276, 279, 70 S.Ct. 641, 643, 94 L.Ed. 834 (1950):

> There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right includes the right to have the ballot counted. * * * It also includes the right to have the vote counted at full value without dilution or discount. * * * That federally protected right suffers substantial dilution * * * [where a] favored group has full voting strength * * * [and] the groups not in favor have their votes discounted.

Quoted in Reynolds v. Sims, 377 U.S. 533, 555 n. 29, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964). See also Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed. 2d 821 (1963); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

4. Code of Virginia § 24–324 requires that the voter's statement that he will be ab-

sent from the precinct or physically unable to go to the polls on election day be subscribed by at least one witness.

5. Code of Virginia § 24–332 requires that a notary public attest on the "voucher" printed on the envelope in which the voted ballot is sealed for return to the electoral board that another envelope marked "ballot within" was opened and the ballot marked and sealed in the return envelope in the notary's presence without assistance or knowledge on the part of anyone as to the manner in which the ballot was prepared.

Code of Virginia § 24–333 requires that a notary public attest on a "coupon" to be returned to the electoral board with the voted ballot that he has no knowledge whatever of the marking of the ballot and that information recorded on the coupon as to the voter's physical characteristics, occupation, and the precinct where he last voted is correct to the best of the notary's knowledge.

Robinson wrote on the papers which he brought with him and put them in his pocket, that she didn't know whether she was voting, that she didn't tell him who she wanted to vote for, that she didn't mark the ballot, and that she didn't know what a ballot was.

James Carter, also illiterate, whose application Crumley witnessed, stated that he did not ask Crumley to have his ballot sent to him in care of Crumley. He stated that he remembered Crumley being at his home only one time, at which time he marked his ballot, sealed it up, made his mark, got his niece to sign his name and returned the ballot to Robinson.

Crumley witnessed the application of a fourth witness, Robert Carter. Crumley testified that he gave Carter a ride to the courthouse and showed him where he could register to vote. Crumley testified further that he was shortly thereafter called into the registrar's office to witness Carter's application for an absentee ballot. However, Carter testified that he did not apply for or cast an absentee ballot, that when Crumley came to his house and asked him to sign some papers he refused, that the only time he ever signed any papers was for food stamps, and that the only time he ever rode with Crumley was when Crumley picked him up drunk and locked him up.

Angus David, Deputy Commissioner of Revenue of Lee County, also contests the sufficiency of the evidence to sustain his conviction. David witnessed 70 applications for absentee ballots in the 1966 election. Twenty-one were sent to the voter in his care, and he notarized 100 vouchers and coupons. Four voters who cast absentee ballots in the election testified for the prosecution against David.

Pansey Woods registered to vote and cast an absentee ballot on the same day. She testified that she came to town with Barbara Boggs in a taxi to register to vote. She stated that the custodian of the courthouse, Porter Greer, took them into a room where some people filled out some papers and then took them into an-other room and showed her where to mark and that David was present when Greer showed her where to mark. The witness stated that she did not plan to be absent on election day and was in good health, that she did not know who was on the ballot and had no preference for any person or party, and that she was illiterate. David notarized the voucher and coupon attached to her absentee ballot.

Barbara Ellen Tabor (nee Barbara Boggs) came to town with Pansey Woods to register. She testified that she did not ask to vote, did not realize that she was voting at the time, and did not then know what a ballot was. She said that she had planned to be away on election day, but that nobody knew it because she had said nothing about her plans. David's name appeared as witness on her application and he notarized her voucher and coupon.

Charlotte Olen Oakley stated that David came to her house twice. The first time he brought an application and the second time he brought the ballot. She said she had not asked to have the ballot mailed in David's care. She stated that she was not sure, but she thought (although she could read and write) that David marked the ballot for her. Her application was witnessed by David, and he notarized the voucher and coupon on her ballot.

Ellen Oliver was the final witness against David. She stated that her son arranged with David to have him take her and her husband to town to register. Mrs. Oliver was apparently disabled and had difficulty walking. She was allowed to register in her car outside the courthouse and recounted the events of that day, as follows:

So when * * * directly, there was a lady came out and she had a book just about like that (indicating), and she sat there and said, "Well now, I have got you registered. You put your name down."

I said, "I can't write. I have to make a cross mark." Well, I did that. So they went * * * she went on

back in, and directly Mr. David and my husband come back out and he sat there and he filled out a paper, a little bitty paper, and had an envelope, and I didn't know what that was about * * * I couldn't understand it.

So he said, "Well now, you make a cross mark." Well, I made a cross mark and he give me an envelope and told me to lick the envelope and close it up.

There was a fleshy man * * * I didn't know him * * * I don't know his name * * * was standing outside the car, and he told me, Mr. David told me to give it to the man, and, he said, "Now we have got everything fixed," and that is all I know.

On being examined further, Mrs. Oliver stated that she didn't know she was voting at the time and that she put no marks on the ballot except where her name was. She stated that she didn't go to vote, she thought she was registering, not voting, and that on election day she went to the polls and voted:

I figured it wasn't election day and I didn't think I was a-voting. * * * I thought all the time you had * * * that you could register all the time, but it would be your place to go to the polls on election day and vote, and I did.

David's name appeared as witness on her application and as notary on the voucher and coupon attached to her ballot.

Finally, Edgar Kirk, a justice of the peace, contests the sufficiency of the evidence to sustain his conviction. Kirk witnessed 23 applications, notarized 57 vouchers and coupons, and received 11 absentee ballots, returned to his care by voters. Jake Freeman, an illiterate whose application for absentee ballot was witnessed by Kirk, testified that he was "fooling around town" about two weeks before the election when he ran into Kirk. He stated that Kirk asked him to go upstairs in the courthouse and vote. Freeman said that he did not plan

to be away on election day, that nobody had asked him if he was going to be away, and that he had said nothing about being away. Nevertheless, he was given an absentee ballot. Kirk was not present when the ballot was voted, but Freeman stated that he told the secretary of the electoral board who helped him mark his ballot that he wanted to vote for Kirk and that the secretary showed him where to mark. Kirk's name did not appear on the ballot.

Jake's wife, Eula Freeman, also illiterate, testified that she had come to town on an earlier date with her father-in-law when she met Kirk, who got her to go to the courthouse to vote. She stated that she did not plan to be away on election day, that Kirk showed her the ballot, and that, when she told him she wanted to vote for him, he showed her where to mark it. Kirk witnessed her application and notarized the voucher and coupon on her ballot.

### III.

Defendants David, Weston, Robinson, and the Rowes, contest the propriety of admitting into evidence certain incriminating statements made by David to agents of the F.B.I. The statements were made during an interview with the F.B.I. that David attended in the Lee County courthouse. The trial court took evidence, in the absence of the jury, and determined that the statements were given voluntarily, a point David concedes. It is contended, however, that the statements were inadmissable because David was not given the warnings required by Miranda v. Arizona, 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court, in dealing with this contention, determined that the warnings were not required because the interrogation was not "custodial":

In holding that one subjected to custodial interrogation must first be warned of his Fifth and Sixth Amendment rights, the [Supreme] Court sought to safeguard these rights for individuals placed by the police in an inherently coercive environment, in-

ducing a feeling of compulsion to answer questions. The purpose was to preserve the right " 'to remain silent unless [the person] chooses to speak in the unfettered exercise of his own will. Malloy v. Hogan, 378 U.S. [1], 18, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).' " *Miranda, supra* at 460, 86 S.Ct. at 1620.

United States v. Gibson, 392 F.2d 373, 375 (4th Cir.1968).

■ The uncontradicted testimony showed that David voluntarily came to the interview, which was held in a judge's chambers near his own office in the courthouse. He stated he knew he did not have to talk to the agents. When the agents handed him a standard form containing a recital of his rights, he took it, held it for a sufficient time to read it, and stated he would not sign it without the advice of an attorney. The evidence showed that David knew he could end the interview at any time and leave. When he did indicate that he wanted to answer no more questions, the interview was immediately terminated, David shook hands with the agents and left.

This was not "custodial" interrogation, *i.e.*, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedeom of action in any significant way." Miranda v. Arizona, *supra* at 444 of 384 U.S., 86 S.Ct. at 1612. The trial court's ruling on the admissability of David's statements was correct.

■ We note also that the trial court was careful to protect the rights of the other defendants by instructing the jury in detail that the statements were to be considered only as they may have had bearing on David's guilt or innocence. The contentions of Weston, Robinson and the Rowes that the statements were, at the joint trial, inadmissable as to them under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), are without merit.

The incriminating statement attributed to David, "I will tell you one thing, I only broke the law when I had to," was incriminating only as to him. It may have involved one other defendant, I. P. Weston, the secretary of the electoral board, from whom David received unexecuted ballots. But I. P. Weston died before trial, and the indictment was dismissed as to him. *Bruton* dealt with statements implicating both defendants, made by a codefendant at a joint trial. David's statement implicated no one but himself.

Moreover, David's codefendants misconstrue *Bruton* insofar as they read it to exclude *all* implicating statements by a codefendant at a joint trial. Unlike the codefendant whose statement was introduced at Bruton's trial, David at his joint trial took the witness stand and did not invoke his Fifth Amendment privileges. *Bruton* was based on the denial of the codefendant's right to cross-examine in violation of the confrontation clause of the Sixth Amendment. In the trial here, David took the stand and was subject to unfettered cross-examination by his codefendants. We find no prejudice to David's codefendants and no error in the admission of his statements at the joint trial.

## IV.

■ Over vigorous government objection the trial judge correctly admitted evidence of certain customary practices as to absentee voting in Lee County that varied in some degree from the practices prescribed by the Virginia statutes. The customs said to have been practiced in Lee County are: (1) a designation may be placed on an absentee ballot that the ballot and accompanying papers be mailed to the applicant "in care of" some third person; (2) the ballot and accompanying papers may be delivered to the third person at the office of the secretary of the electoral board instead of being mailed to the voter; and (3) persons may be permitted to vote by absentee ballot as a matter of convenience, or,

otherwise put, the Virginia Code § 24-319 stating that an absentee ballot will be issued when the voter will be absent from his *precinct* on election day has for years in Lee County been construed to mean that absentee ballots will be issued when the voter expects to be absent from the *polls* for any reason on election day.[6]

■ Not content with having been allowed to put this evidence before the jury, defendants now insist that the court erroneously limited its effect. It is urged that the effect of custom should be to amend and delimit Virginia statutory law. We think not. We approve the trial court's ruling that the evidence on custom was to be considered by the jury only as it had bearing on the issue of intent, *i.e.*, whether or not the defendants knowingly and willfully conspired to cause votes to be cast by procedures in contravention of Virginia's absentee voting laws.

In supplemental briefs filed after oral argument appellants belatedly assert a new theory supporting their old contention that custom in Lee County must be held to have changed the statutory voting laws of Virginia. Our attention is called to Vanover v. Maloney (E.D.Va. 1969), and especially to Judge Butzner's decision, 4th Cir. Misc. No. 581 (July 14, 1969), denying a stay pending appeal. In *Vanover* the district court was concerned with the effect of the Voting Rights Act of 1965 upon an attempt by the Dickens County Democratic Committee to require a party loyalty oath of all voters in a primary election, as authorized by the Code of Virginia (1964 Replacement Vol.), §§ 24-367, 24-368. The prohibitions of 42 U.S.C. § 1973b(a) are operative in Virginia. South Carolina v. Katzenbach, 383 U.S. 301, 318, 86 S.Ct. 803, 15 L. Ed.2d 769 (1966). Therefore, absent approval by the Attorney General or by

the District Court of the District of Columbia, Virginia and its counties shall not enact or seek to administer as a condition to suffrage "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 * * *." 42 U.S.C. § 1973c. Since no party loyalty oath had previously been required in Virginia, *Vanover* held that the new loyalty oath requirement was practice or procedure "different from that in force or effect on November 1, 1964." Consequently, pursuant to the mandate of 42 U.S.C. § 1973c, the right to vote could not be denied for failure to comply with this new requirement.

Appellants build on *Vanover* a false syllogism, as follows. By custom in Dickinson County the loyalty oath was not administered. By custom in Lee County the absentee voting law was not enforced. Under *Vanover*, 42 U.S.C. § 1973 "would preclude a change in a local practice in Dickinson County." Therefore, 42 U.S.C. § 1973c must prohibit giving effect to statutory voting law of Virginia that is different from local custom in Lee County.

We think the cases are as different as apples and oranges. *Vanover* simply stands for the proposition that the 1965 Voting Rights Act prevents any change of lawful election procedures that may delimit suffrage without compliance with the Voting Rights Act. To cite *Vanover* for the proposition that custom may alter the voting statutes is a clear distortion. Its meaning is nearly the opposite: not even the Democratic Party of Dickinson County, acting under the statutory authority of the Legislature of Virginia, can change the voting law so as to impede or make more difficult the right to vote. Adherence to the

---

6. We note, however, that the evidence tended to show that often absentee voters, many of whom were illiterate, did not themselves designate that the ballot was to be sent to them in care of some third person, but that this designation was made for them often without their knowledge or consent by the person to whom the ballot was actually sent. Likewise, the designation on the application that the voter would be absent from the precinct was often made by one other than the voter.

statutory voting laws of Virginia instead of asserted "custom" infringes on no one's right to vote. Instead, it protects that right by making more difficult the fraudulent practices of these appellants. We think *Vanover* is wholly irrelevant to the question presented us.

We have considered the several contentions made by appellants that the final argument of government counsel was improper and prejudicial, that the court's instructions to the jury were inadequate and prejudicial, and that there was error in the discharge of two jurors and the substitution of alternate jurors. We find no merit in them. The other issues raised in the briefs and on oral argument have been considered and merit no discussion here.

Accordingly, for the reasons stated, the convictions are

Affirmed.