**UNITED STATES of America,**
**Plaintiff,**

v.

**The STATE OF ALABAMA and Perry O. Hooper, Judge of Probate of Montgomery County, Alabama, Defendants.**

**Civ. A. No. 2255–N.**

United States District Court
M. D. Alabama, N. D.
March 3, 1966.

———◆———

Ben Hardeman, U. S. Atty., Montgomery, Ala., Stephen J. Pollak, Brian K. Landsberg, John M. Rosenberg and Charles R. Nesson, Attys., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Gordon Madison, Asst. Atty. Gen., of Alabama, Montgomery, Ala., James Garrett (of Rushton, Stakely & Johnston), and John P. Kohn, Montgomery, Ala., for the State of Alabama.

Jack Crenshaw and Maultsby Waller (of Crenshaw & Waller), Montgomery, Ala., for defendant Perry O. Hooper.

Before RIVES and GEWIN, Circuit Judges, and JOHNSON, District Judge.

RIVES, Circuit Judge:

■ Congress in enacting the Voting Rights Act of 1965 "directed" the Attorney General to institute suits "against the enforcement of any requirement of the payment of a poll tax as a precondition to voting." [1] The Voting Rights Act of 1965 included Congress' specific findings that the poll tax violates the Fourteenth and Fifteenth Amendments.[2] Pursuant to the direction of Congress, the Attorney General on behalf of the United States here seeks a judgment declaring unconstitutional and enjoining the enforcement of Sections 178 and 194 of the Alabama Constitution and the statutes implementing those sections of the Constitution which precondition the right to vote in State, local, general, special and primary elections on payment of a poll tax for each of two years next preceding the election. We hold that the Alabama poll tax violates the Fifteenth Amendment to the United States Constitution, and Judge Johnson, as indicated by his concurring opinion, would also hold that it violates the due process clause of the Fourteenth Amendment. The poll tax is therefore invalid.

The Constitution and statutes of Alabama [3] require that, in order to vote in any election, a person must (1) be a citizen of the United States and 21 years of age or older; (2) have resided in the State one year, in the county six months, and in his voting precinct three months prior to any election in which he seeks to vote; (3) be able to read and write any article of the United States Consti-

---

1. P.L. 89–110 § 10(b).

2. P.L. 89–110 § 10(a).

3. Paragraphs 3–9 of the Complaint which allege these provisions in general terms are admitted by the defendants.

The requirements and procedures for registration and voting in Alabama are contained in Article 8 of the Constitution of Alabama of 1901, §§ 177–196 and in Title 17 of the Code of Alabama 1940, ᵕ §§ 1–426.

tution,[4] not be an idiot or insane person or have been convicted of any of certain enumerated crimes; and (4) have paid the poll taxes for which he is liable.[5]

A poll tax in the amount of $1.50 is imposed annually on every non-exempt resident of the State between the ages of 21 and 45.[6] The Constitution and statutes exempt from the payment of the tax all persons over 45; veterans of World War I, World War II, and the Korean War; presently serving members of the Alabama Naval or National Guard, or those who were members for 21 years.[7] The poll tax can be paid only between October 1 and February 1.[8] During this period the prospective voter must have paid the poll taxes due for the previous two years in order to vote in an election in the ensuing year.[9] Collection of the poll tax by enforcement of legal process is prohibited.[10] The funds collected are used for the support of public schools.[11] Poll taxes are paid to the County Tax Collector.[12] On or before March 15 of each year the collector is required to furnish the Judge of Probate in his county with a list, by name, sex and race, of those persons who have paid the poll tax.[13] The Probate Judge compiles the list of qualified voters by comparing the list of registered electors with the poll tax lists furnished to him by the tax collectors,[14] and furnishes the list of qualified electors to the appropriate election officials.[15]

Under Article I, Sec. 2, Clause 1 of the United States Constitution and under the Seventeenth Amendment, the States are empowered to set reasonable qualifications for voters in elections of members of Congress. As to State and local elections, that right is reserved to the States by the Tenth Amendment. The power of the States over suffrage is recognized by the Fifteenth Amendment, but that coordinate amendment restricts the States' power to regulate suffrage under certain circumstances. The Fifteenth Amendment provides that: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Therefore, any requirement that "abridges" the right to vote "on account of race, color, or previous condition of servitude" is invalid.

Negroes were first enfranchised in Alabama under the Constitution of 1867 which provided that every male person 21 years of age and over who satisfied the citizenship and residence require-

4. The State of Alabama has been certified by the Attorney General of the United States and the Director of the Census as a state subject to the provisions of Section 4 of the Voting Rights Act of 1965, 30 Fed.Reg. 987 (August 7, 1965). Accordingly, literacy tests may not be required as a prerequiste to voting in elections in Alabama.

5. The Twenty-fourth Amendment to the United States Constitution proscribes the requirement of poll taxes as a prerequisite to voting in federal elections.

6. Ala.Const., Art. 8, § 194.

7. Ala.Const., Art. 8, § 194; Ala.Code, Tit. 51, § 238.

8. Ala.Const., Art. 8, § 194; Ala.Code, Tit. 51, § 243 (1940).

9. Ala.Code, Art. 8, § 178 (1953). Section 10(d) of the Voting Rights Act of 1965 requires that initial registrants be allowed to vote in elections if they have tendered payment of the poll tax for the current year up to 45 days before the election.

10. Ala.Const., Art. 8, § 194.

11. Ala.Code, Tit. 51, § 237 (1940).

12. Ala.Code, Tit. 51, § 273 (1940).

13. Ala.Code, Tit. 51, § 247 (1940).

14. Ala.Code, Tit. 17, § 38 (1940).

15. Ala.Code, Tit. 17, § 40 (1940).

ments "shall be deemed an elector."[16] With the end of reconstruction in Alabama came the mounting efforts of the white citizens to regain their former political supremacy. History records the sordid attempts to disfranchise the Negro voters through fraud and often outright intimidation. Those practices shocked the conscience and were not entirely effective. A demand grew for more sophisticated means of depriving Negroes of the vote.

As shown by contemporaneous newspapers at the turn of the century attention was focused on amendments to the State Constitution setting suffrage requirements which would permit white persons to vote but effectively disfranchise Negroes.[17] On May 21, 1901, a State Constitutional Convention assembled largely, if not principally, for the purpose of changing the 1875 Constitution so as to eliminate Negro voters.

Delegate after delegate took the floor eager to be put on record [18] as favoring "the absolute disfranchisement of the Negro as a Negro."[19] They did "not believe in disfranchising a single white vote."[20] Viewed in the context of today, these testimonials are fraught with discredited notions, such as: "I say here without fear of contradiction that if there is any good in the Negro race such as elevates a nation or elevates his race, I say that good comes from the Caucasian blood that runs in his veins."[21] The Journals of the Convention leave absolutely no doubt as to what the delegates of the white citizens of Alabama wished the Convention to accomplish:

"*  *  * We want the white man who once voted in the state and controlled it to vote again. We want to see that old condition restored. Upon that theory we took the stump in Alabama having pledged ourselves to the white people upon the platform that we would not disfranchise a single white man if you trust us to frame an organic law for Alabama, but it is our purpose, it is our intention, and here is our registered vow to disfranchise every Negro in the state and not a single white man."[22]

Although the delegates expressed the view "that the State of Alabama never adopted the 15th Amendment,"[23] or any of the other reconstruction amendments, they were anxious to provide devices that

16. Ala.Const. of 1867, Art. VII. Excluded from the electorate were those who had violated the rules of civilized warfare during the rebellion, idiots and insane persons, those who had been convicted of certain serious crimes, and persons who were disqualified under federal law. Section 5 of the first Reconstruction Act of March 2, 1867 (14 Stat. 429), required as a precondition to readmission to the Union that States adopt constitutions which gave the franchise at least to all males 21 years old, regardless of race and of previous condition of servitude, who had been residents of their States for at least one year.

17. Official Proceedings of the Constitutional Convention, State of Alabama, May 21, 1901 to Sept. 3, 1901 [hereinafter called Off.Proc.] pp. 2843–4 (Pl.Ex. 42, 44).

18. Delegate Heflin's speech in support of secrecy was reported in the Montgomery Advertiser on July 16, 1901 (Pl.Ex. 47):
"He [Heflin] said he was in favor of discussing the suffrage question in caucus. He thought it would be unwise for the debates on the question to go out to the world by the medium of the stenographic report. He said there was a minority report that would cause considerable debate and he therefore thought the matter should be settled in caucus. It had been suggested, he said, that if the State Constitution ever went to the United States Supreme Court that tribunal might go through the stenographic report to find a motive by which to reverse the constitution."
See also comment by Delegate Williams of Marengo County, Off.Proc. p. 3837.

19. Comment by Delegate Williams of Marengo County, Off.Proc. p. 3837.

20. Ibid.

21. Id.

22. Comment by Delegate Heflin of Chambers County, Off.Proc. pp. 2843–4 (Pl. Ex. 47); See also comment by Delegate Watts, Off.Proc. pp. 2388–9.

23. Comment by Delegate Watts, Off.Proc. pp. 2388–9.

would avoid a legal attack based on the Fourteenth and Fifteenth Amendments but still successfully subvert the purpose of those amendments. One solution to the dilemma adopted by the delegates was the poll tax. Delegate Hood voiced his approval as follows:

"Now in my judgment, this poll tax qualification is the most important provision in this entire article. We are told that in the Black Belt and that in many counties in the state, there is a large percentage of those young Negroes who are coming of age that will be able to read and write, therefore will be qualified under the provisions of this article. The only safety valve, Mr. President, that is contained in this article after 1903 for a large proportion of the Negroes in this State is this poll tax of $1.50.

\* \* \* \* \* \*

"Now the main purpose of this Committee in dispensing with the compulsory collection of the poll tax was to allow the poll tax to accumulate and to pile up on this class of voters that we want to get rid of—the vicious voter in Alabama. We want that poll tax in Alabama. We want that poll tax to pile up so high that he will never be able to vote again. If you provide a compulsory way of collecting the poll tax you destroy the objects and purposes of the committee in reporting the provision as it is reported." [24]

The suffrage plan which finally emerged from the Convention with the overwhelming support of the delegates was a two-stage affair.[25] The temporary provisions, effective until January 1, 1903, included a grandfather clause for veterans and their descendants under which most white persons could register without meeting other new requirements, and a requirement that voters be of good character and understand the duties of citizenship. The permanent plan, effective on January 1, 1903, included a residence requirement, education, employment and property qualifications, a disqualifying crimes provision, and the noncompulsory cumulative poll tax requirement—cumulative from January 1, 1901.[26]

The effect of the new suffrage provisions in the 1901 Constitution on the Negro voters was dramatic. Whereas in 1900, 100,000 Negroes had voted in Alabama, the number eligible to vote under the temporary plan in 1903 dropped to 2,980 while white registrants numbered 191,492. In 1904 the registration figures show a total of 3,654 Negroes and 205,278 whites registered. By 1908 there were only 3,742 Negroes registered, while white registration had risen to 250,381.[27]

We hold that from its inception the Alabama poll tax was illegal and invalid as an attempt to subvert the Fifteenth Amendment to the United States Constitution. The necessary effect of the poll tax as adopted in 1901 was to disfranchise Negro voters. The history of the poll tax leaves no doubt that this was its sole purpose. Such clear and intentional attempt to deny or abridge the right to vote necessarily runs afoul of the Fifteenth Amendment.

■ Like the Fourteenth Amendment, the Fifteenth Amendment does not disable any appropriate governmental body from regulating suffrage where a legitimate State interest exists. The two amendments mean simply that the States and the Federal Government must exer-

24. Off.Proc. pp. 3380–1. See also comments by Delegate Porter, Off.Proc. pp. 3018, 3020; by Delegate Freeman, Off. Proc. p. 2811; and by Delegate Reese, Off.Proc. pp. 3367–8.

25. Off.Proc. pp. 3840–7.

26. On December 28, 1953, a constitutional amendment was ratified which limited the cumulative feature of the poll tax to the two calendar years next preceding the date of election at which the elector offers to vote, the maximum amount payable being $3.00. Ala.Const., § 178, as amended December 28, 1953.

27. Alabama Official and Statistical Register 1907 and 1911; Alabama Official Directory 1903 and 1905.

cise their powers so as not to discriminate between their inhabitants, except upon some reasonable differentiation fairly related to the object of the regulation. The Fifteenth Amendment teaches that race can never be a reasonable ground for discrimination.

The poll tax was born of an effort to discriminate on the basis of race or color and it has had just that narrow effect. The equality provided by the Fifteenth Amendment is not an abstract principle of justice. The framers of our fundamental charter of liberty knew, and we must never forget, that there is no more effective or *practical* guaranty against arbitrary and unreasonable government than to require that the principles of law which governments impose on a minority must be equally and fairly applicable to the majority. Moreover, nothing encourages arbitrary and offensive discrimination more effectively than allowing governments to pick those few upon whom the heavy hand of government will fall and thus escape the political retribution that might meet them at the polls should the majority be truly affected. Courts can take no better step toward preserving our heritage of liberty than to strike down such narrowly discriminatory measures.

■ Some may argue that on its face the poll tax has an equal and broad field of operation. But no more conclusive refutation of that argument exists than the Journals of the 1901 Constitutional Convention with their demonstration that the measure was carefully drawn to exclude Negroes from voting. It has been argued that while the poll tax was unconstitutional at its inception, subsequent changes have breathed life into its tortured body. Section 178 was amended in December 1953 so as to make the poll tax cumulative for only two years.[28] Successive amendments to section 194 have created broad exemptions relieving from payment veterans of World War I,

World War II, and the Korean War; those presently serving in the Alabama Naval or National Guard or those who were members for 21 years; and those citizens of Alabama who are blind or deaf.[29] While these amendments are ameliorative, they are not curative. The poll tax remains one of the last great pillars of racial discrimination. In effect, the tax still bars a large number of Negroes from the polls.

■ What legitimate State interest has emerged to render constitutionally valid statutes or constitutional provisions that were invalid at their inception? Has the State become wedded to some policy that could provide a rational non-discriminatory basis for this tax? The State of Alabama advanced six reasons which it conceived to be legitimate State interests sufficient to overcome the inherently discriminatory effect of the poll tax: 1. It "is a test of good citizenship." 2. "It keeps out those unworthy voters who have no interest in public affairs." 3. It keeps out those "too inert to pay." 4. "The voters' interest in protecting the ballot is indicated." 5. It indicates "concern for public education for which the poll tax is levied." 6. It "tests a citizen's interest in the conduct of elections."

For the sake of argument, let us assume that such interests might be sufficient to save a poll tax from constitutional attack. Can these State interests come now to the rescue of the Alabama poll tax? We think not. There is nothing in the history of the poll tax since 1901 to indicate that the State of Alabama has ever abandoned its original discriminatory purpose.

World War I may well have been largely fought by public-minded volunteers, but subsequent conflicts have found the use of the draft a more reliable means of raising a citizens' army. The military exemption to the poll tax does not necessarily supply a substitute test for "good

---

**28.** Amendment No. 96 which was in pertinent part re-enacted November 1962 in Amendment No. 207.

**29.** By Amendment Nos. 10, 14, 49, 90, 109.

citizenship" or "interest in public affairs." Surely it bears no correlation to an interest in education, nor does it demonstrate that a person is not "too inert to pay." Moreover, the test must be one of *current* interest in public affairs because the tax is an annual tax. If current interest were not the true test, then merely registering to vote would demonstrate an interest in public affairs. Participation in past wars is no current test of interest in public affairs. A man's blindness or deafness represents no test of these interests either. What the present exemptions do recognize is the inherently discriminatory nature of the tax. Therefore, we believe that the amendments to the poll tax demonstrate no intention of surrendering its discriminatory purpose in favor of such abstract purposes as proposed by the State. There are more direct and effective ways to test the six interests outlined by the State. Those alleged interests amount to no more than ingenious afterthought.

More telling is the fact that, from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society. Statutes, cases and the statements of its Governors demonstrate that the State's resistance to the rights of Negroes to equal treatment continued even after the Congress and the Supreme Court of the United States had expressly declared that the State's action was unconstitutional.[30] Such a policy naturally operates to cause white public officials to carry out their duties in a manner which favors white persons, and deters Negroes from acting affirmatively to overcome the special burden imposed by this environment on their exercise of political rights. In this environment the poll tax, uniquely a part of the original package of discriminatory political devices, cannot be administered consistently with the commands of the Fifteenth Amendment.

We find that there are still forty-four sections of the Alabama Code devoted to the maintenance of segregation[31] in schools,[32] public utilities,[33] mental institutions,[34] nursing,[35] penal and correctional institutions,[36] pauper care,[37] and the marriage choice.[38] Negroes have been excluded from municipal recreational facilities and swimming pools,[39] parks,[40] libraries and museums,[41] and from jury service.[42]

When Negroes began once more to achieve the right to vote, the State Legislature went so far as to re-draw the boundaries of the municipality of Tuskegee so as to deny Negroes effective par-

---

30. See infra p. 102.

31. These statutes under decisions of the Supreme Court may now be unconstitutional.

32. Title 52, §§ 24, 33, 36, 44(1), 45, 49, 52, 61(8), 297, 335, 339, 443, 452, 454, 455, 455(3), 466, 519, 573, 590, 591, 613 (1), 451(8).

33. Title 48, § 186 (train stations); §§ 196, 197 (train coaches); § 301 (31a–31c) (bus stations and buses; § 464 (criminal penalty).

34. Ala.Code, Tit. 45, § 248 (1940).

35. Ala.Code, Tit. 46, § 189 (1940).

36. Ala.Code, Tit. 45, §§ 52, 121, 122, 123, 183, 248; Tit. 12, § 188.

37. Ala.Code, Tit. 44, § 10.

38. Ala.Code, Tit. 14, §§ 360–361.

39. Faulkner v. City of Gadsden, 9 Race Rel.L.Rep. 876 (1964).

40. City of Montgomery, Ala. v. Gilmore, 5 Cir. 1960, 277 F.2d 364.

41. Cobb v. Montgomery Library Board, M.D.Ala.1962, 207 F.Supp. 880.

42. Norris v. State of Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Patterson v. State of Alabama, 1935, 294 U.S. 600, 55 S.Ct. 575, 79 L.Ed. 1082; Rogers v. State of Alabama, 1903, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417; Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53; Mitchell v. Johnson, M.D.Ala., 250 F.Supp. 117, decided Jan. 18, 1966: White v. Crook, M.D.Ala., 251 F.Supp. 401, decided Feb. 7, 1966.

ticipation in their local government.[43] Just last year in an effort to exclude Negroes from participation in State government, the Legislature passed a racially gerrymandered reapportionment scheme.[44]

The Supreme Court's opinion in 1954 that segregation in public schools is unconstitutional [45] was declared "as a matter of right null and void and of no effect" by both houses of the Alabama Legislature in 1956.[46] The Legislature, as well as succeeding Governors, continued to publicly denounce the *Brown* decision with statements of disapproval and determined resistance.[47]

The declarations of the Legislature itself recognized the racial character of this tax. In 1942, when the Senate of the United States was considering anti-poll tax legislation, both houses of the State of Alabama Legislature passed a strong resolution commending its Senators in the Congress for [48] "their magnificent fight against the measure now pending in Congress which is calculated to destroy our Poll Tax Law, upset our methods of holding elections and seriously affect the friendly relations now existing between the races."

In 1943 both houses by joint resolution urged the State's Senators to fight vigorously in Congress the anti-poll tax legislation. They resolved as the reason for fighting the proposed legislation: [49]

"WHEREAS, throughout the years since Reconstruction there has been an amicable and friendly relationship between the two races in the South, and the continuous agitation from outside sources is creating bitterness and hostility, greatly to the detriment of our people, both white and black, creating racial disturbances much to be regretted at any time, but particularly so in time of war, and is preventing the orderly solution of our problems in a manner assuring lasting justice to both races."

With the coming of large scale Negro voter registration, the State mustered the combined forces of the Governor's office, the State sovereignty Commission, the State Department of Education, and the Alabama Department of Public Safety to encourage white persons to register to vote and to pay their poll tax.[50] Alabama State Troopers distributed 600,-000 brochures entitled "A message from Governor George C. Wallace" [51] to white, but not Negro, schools between January

---

43. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.

44. Sims v. Baggett, M.D.Ala.1965, 247 F. Supp. 96.

45. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

46. Acts of Alabama, Vol. 1, p. 70 (1956).

47. Both Houses again condemned the Brown decision in 1957. Act of Alabama No, 514, Vol. 2, p. 1098 (1963), and resolved not "to submit voluntarily to the integration of our schools" in 1963. House Joint Resolution 23, January 9, 1963. Governor Patterson in his last message to the Legislature stated: "There was no integration when I took office and there is none today." Address to Joint Session, January 8, 1963. Governor Wallace was personally enjoined from interfering with school and university desegregation on two occasions. United States v. Wallace, D.C., 1963, 218 F.Supp. 290; United States v. Wallace, D.C., 1963, 222 F.Supp. 485.

48. House Joint Resolution No. 8, adopted November 20, 1942.

49. Senate Joint Resolution No. 42, June 3, 1943.

50. Stipulation No. 5 in this case.

51. Stipulation No. 5 in this case, Attachment D (Statement of Eli Howell).

17 and January 20, 1966, less than two weeks before the poll tax deadline and while this case was pending before this Court. The brochure is as follows:

## WHEN TO PAY POLL TAXES

If you are already registered to vote, you must pay your poll tax by February 1, 1966.

If you register to vote after February 1, you may pay your poll tax up to 45 days prior to an election.

Persons over 45 years of age and veterans of wartime service may not have to pay the poll tax. Check your Judge of Probate on questions relating to the poll tax.

Register and vote for Freedom's Sake.

4.

A MESSAGE FROM

GOVERNOR
GEORGE C. WALLACE

Endorsed by:
Dr. Austin R. Meadows
State Superintendent of
Education

## WHEN TO REGISTER

All County Boards of Registrars — except in Calhoun, Etowah, Jefferson, Madison, Mobile, Morgan and Tuscaloosa counties — will be in session 10 days starting January 10, 1966, and 5 days starting January 24, 1966.

The seven named counties have special schedules. Check your local Board of Registrars for additional dates on which they will register voters after January.

Register today and vote in 1966.

2.

Governor's Office
Montgomery, Alabama

Dear Student:

It is a great privilege to help protect our nation and our freedoms by voting.

Please ask members of your family 21 years of age or older, if they are registered to vote and if they have paid their poll tax.

In order to vote this year a citizen must be registered and must have paid his poll tax. Will you please take this message home to your parents.

Sincerely yours,
George C. Wallace
Governor

The explanations tendered by the State for its failure to distribute the pamphlets at Negro schools are clearly specious. Thus, an unknown number of white citizens of Alabama will be able to vote this year because the State utilized its segregated schools to remind white persons to pay the poll tax. If this Court does not intervene, the State's failure to distribute the brochures to Negroes would mean that some of them would lose the right to vote in 1966. Even if the poll tax were valid, no injunction limited to such discriminatory administration of the poll tax in the future can aid those Negroes who through inadvertence and failure to receive the Governor's message failed to pay the poll tax.

In Wilcox County in 1964, when no Negroes had yet become registered voters, the Tax Collector testified that he did not look at the poll tax or the poll tax records, as the Probate Judge said everybody was permitted to vote whether or not the poll tax had been paid. It was not until the passage of the Voting Rights Act of 1965 that payment of poll taxes became a precondition to voting in Wilcox County. As this Court said in Sims v. Baggett,[52] "The long history of the Negroes' struggle to obtain the right to vote in Alabama has been trumpeted before the Federal Courts of this State in great detail. * * * If this court ignores the long history of racial discrimination in Alabama, it will prove that justice is both blind and deaf." We would be blind with indifference, not impartiality, and deaf with intentional disregard of the cries for equality of men before the law.

There is nothing in the subsequent history of the poll tax that would indicate sufficient change in its purpose for us to overlook its inherent defects. Nor would an injunction of its present discrimina-

tory application serve to eliminate the inconsistency between any allegedly valid motivation and the present poll tax exemptions.

Even after the passage of the 1965 Voting Rights Act the State of Alabama has continued to administer the poll tax in a discriminatory fashion, further magnifying its injustices. Tax collectors accord many privileges to whites not accorded to Negroes. In some counties acquaintances and friends of the tax collector receive personal notice that their poll tax is due. In other counties, tax collectors accept payment from friends when they see them outside the tax collector's office, or agree by phone to make out receipts and receive payment the next time they see the person, or permit payment by third persons. Since these practices are restricted to friends of the tax collectors and since the tax collectors are not on intimate terms with the Negro community, these practices place a greater burden on Negroes than on whites.

The Fifteenth Amendment question is whether the Alabama poll tax abridges the right to vote on account of race.[53] The evidence in this record compels the conclusion that it does. When the purpose and effect of a state voting requirement is to abridge the right of Negroes to vote on account of their race, the requirement violates the Fifteenth Amendment and cannot stand. Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709; Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340. The injunction will therefore issue as prayed.

JOHNSON, District Judge.

I concur in the foregoing opinion and express my further views in the following separate opinion.

---

52. 247 F.Supp. 96, at 108–109.

53. Significantly, the Fifteenth Amendment uses the term "abridged" as well as "denied." Websters New International Dictionary defines abridged as: "To make shorter; to shorten in dura-

tion; diminish; curtail; as, to abridge a visit * * *. To deprive; to cut off; —followed by 'of', and formerly by from; as, to abridge one of his rights." Websters New International Dictionary, Second Edition, 1959, p. 7.

GEWIN, Circuit Judge.

For the reasons stated in my opinion attached hereto I respectfully dissent.

JOHNSON, District Judge (specially concurring):

The evidence in this case fully justifies and requires a declaration that the Alabama poll tax in its original purpose and effect and in its continued application and effect disfranchised and disfranchises Negroes in the exercise of their right to vote; the tax clearly violates the Fifteenth Amendment. I do, therefore, join with Judge Rives in so holding. However, in my opinion, the fundamental issue in this case and one that should be decided prior to reaching the Fifteenth Amendment issue is whether *any* tax levied on voting and carrying the sanction of disfranchisement for non-payment is constitutionally permissible under the due process clause of the Fourteenth Amendment. I am of the firm opinon that it is not. The poll tax is invalid in its very conception; the principle of a tax on the right to vote is constitutionally indefensible.

It is generally recognized, and the parties to this suit do not contend otherwise, that the State may determine qualifications on the right to vote. Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). Moreover, there is no disagreement that when a person becomes qualified he has a constitutional right to cast his vote and have it counted. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); it must be determined, therefore, what the term "qualification" means; that is, what are the constitutional limitations placed on the State's power to determine "qualifications" for the exercise of the franchise.

An early decision has suggested, in dictum, that "the state may condition suffrage as it deems appropriate." Breedlove v. Suttles, 302 U.S. 277, 283, 58 S.Ct. 205, 208, 82. L.Ed. 252 (1937). The Court in *Breedlove*—not resolving the due process issue presented in this case—held only that the Georgia poll tax requirement did not violate the equal protection clause or the privileges and immunities clause of the Fourteenth Amendment. However, since *Breedlove* was decided—and in particular during the last decade—the right to vote has received greater recognition by the courts and legislatures alike. The reapportionment cases [1] and the recent decision of Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), require a recognition that today voting is the most important means of participating in our democratic society. Recognition of this is implicit in the declaration of the Supreme Court in Reynolds v. Sims, supra, that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." 377 U.S. at 555, 84 S.Ct. at 1378. There is similar language in Wesberry v. Sanders, supra:

> "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which * * * we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." 376 U.S. at 17, 84 S.Ct. at 535.

The contention that the reapportionment decisions are wholly inapplicable for our purposes here, since in those cases only qualified voters were before the Court, ignores the clear thrust and intendment of those decisions. Those

---

1. Reynolds v. Sims, supra; WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964); Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). See also Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed. 2d 481 (1964).

decisions clearly represent judicial cognizance of the fundamental role the exercise of the franchise plays in our system of representative government. Moreover, in Carrington v. Rash, supra, in which the parties before the Court were not qualified voters under the laws of the State of Texas, the Court stated, "We deal here with matters close to the core of our constitutional system." 380 U.S. at 96, 85 S.Ct. at 780.

I, therefore, am in full agreement with the statement of the Court in the recent Texas decision:

"[I]t cannot be doubted that the right to vote is one of the fundamental personal rights included within the concept of liberty as protected by the due process clause." [2]

It is important to recognize that the Supreme Court has *only recently* determined that the Fourteenth Amendment limits the power of the states to fix voting requirements for state elections. Carrington v. Rash, supra; Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); Schnell v. Davis, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949). Carrington and Louisiana were certainly qualifications of the dictum of Breedlove which had already been qualified by Schnell and Lassiter v. Northampton County Bd. of Elections, supra. In Lassiter, the Court applied a due process test in examining the reasonableness of the State's limitations on the exercise of the franchise:

"We come then to the question whether a State may consistently with the Fourteenth and Seventeenth Amendments apply a literacy test to *all voters irrespective of race or color.*" 360 U.S. at 50, 79 S.Ct. at 989. (Emphasis added.)

Having then reviewed the decisions upon which Breedlove relied, the Court, in a significant passage, said:

"We do not suggest that *any standards* which a State desires to adopt may be required of voters.

But there is wide scope for exercise of its jurisdiction. Residence requirements, age, previous criminal record * * * are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters." 360 U.S. at 51, 79 S.Ct. at 990. (Emphasis added.)

Therefore, it must be concluded that the states have the power to impose only reasonable limitations on the exercise of the franchise, and that any limitation or condition on the exercise of that right which does not bear a reasonable relationship to the intelligent exercise of the ballot is not a "qualification" and, as such, is not authorized by Art. I, § 2, but, on the contrary, is violative of the due process clause of the Fourteenth Amendment. It must always be kept in mind that the power of a state to determine qualifications to vote must be exercised precisely and circumspectly so as to limit the franchise no more than is clearly necessary to effectuate the state's legitimate interest.

A poll tax limitation on the exercise of the franchise is not such a reasonable limitation, since such a tax bears no reasonable relationship to the intelligent exercise of the vote. As previously stated, it is generally recognized that the states have a wide "jurisdiction" to determine voter qualifications. Lassiter v. Northampton County Bd. of Elections, supra. For instance, a state may deny the franchise to minors, convicted criminals, nonresidents and to those who fail or refuse to register. In all such cases there must be at least a reasonable relation between the measure limiting the franchise and the goal of representative government— government by officials elected by the state's responsible citizens. There is no such relation in the case of the poll tax; it is nothing more than a license on the right of citizens who are otherwise qualified to participate in our democratic system.

**2.** United States v. Texas et al., D.C., 252 F.Supp. 234 (February 9, 1966).

The only argument advanced in justification of the poll tax as a method for the regulation of the exercise of the franchise in a manner consistent with the goal of representative government worthy of extensive comment [3] is that it "limit[s] the right of suffrage to those who * * * [take] sufficient interest in the affairs of the State to qualify themselves to vote." Campbell v. Goode, 172 Va. 463, 467, 2 S.E.2d 456, 457. A similar notion has been expressed by the Supreme Court of Alabama. See Davis v. Teague, 220 Ala. 309, 125 So. 51, appeal dismissed, 281 U.S. 695, 50 S.Ct. 248, 74 L.Ed. 1123 (1929). But the contention that the poll tax disfrancises the shiftless and conduces to voting by the civic-minded does not withstand analysis. There is no procedure for the assessment of the poll tax in Alabama. The burden is on the individual citizen to come forward and pay the tax by February 1—more than nine months in advance of the general election. Moreover, the tax is collected only during the four months prior to February 1—a period in which political activity is relatively quiescent. Both the Court,[4] as well as Congress,[5] have recognized that these requirements place on a person who desires to vote the burden of taking the initiative and paying his poll tax. Moreover, the majority of the electorate is exempt from payment of poll taxes because of age, military service or other reasons granted by statute. If voter interest is its rationale or it is a test of good citizenship, there is clearly no rational basis for exempting persons over the age of forty-five. Furthermore, the fact that *anyone*—not just the potential voter—may pay indicates that the State does not use the tax as a standard to measure the intelligent and interested exercise of the franchise.[6]

---

3. The six factors which the state asserts justify the imposition of its poll tax are: "(1) Its payment is a test of good citizenship * * * (2) It keeps out those unworthy voters who have no interest in public affairs. (3) Those who are too inert to pay the small fee required are kept out. (4) The voter's interest in protecting the ballot * * *. (5) One's concern for public education for which the poll tax is levied. (6) It tests the citizens' interest in the conduct of elections." Brief of State of Alabama, pp. 3–4. Each of these does not need to be specifically dealt with since the principles developed *infra* have general applicability.

4. Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

5. "* * * Nothing in the payment of a poll tax evidences one's 'qualification' to vote. A man with a million dollars in the bank cannot vote if he fails to pay the tax; a man who steals a couple of dollars to pay the tax has met this condition. A poll tax has nothing in common with true 'qualifications': Age (reflecting maturity of judgment); residency (reflecting knowledge of local conditions), etc. Once it is demonstrated that the poll tax cannot be justified as a qualification for voting fixed by the States under article I of the Constitution, good cause for this restriction on the right to vote is hard to find. No one seriously contends that it is a revenue measure. Forty-six States deem it unwise. * * * In their administration, no less than by their arbitrary restriction, these exactions lend themselves to notorious abuse. Some poll taxes must be paid in advance, by a specified date—or the right to vote lapses; cumulative charges have to be satisfied, perhaps pricing the vote out of market for the indigent applicant. Surely, in the light of its recent expressions (see, e. g., Harman v. Forssenius, 85 S.Ct. 1177, 380 U.S. 528, October term, 1964 (decided Apr. 27, 1965)), the Supreme Court can be expected to recognize and strike down these arbitrary restrictions on the right to vote, particularly so when Congress has determined that their elimination is appropriate to the safeguard of the rights of citizens under the 14th and 15th amendments." H.Rep.No.439, 89th Congr., 1st Sess., p. 22, U.S.Code Cong. & Admin.News 1965, p. 2453.

These congressional findings are "entitled at least to great respect." Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921).

6. In the oral arguments before this Court, one of the attorneys for the State of Alabama likened the poll tax to a "rough intelligence test":

"JUDGE JOHNSON: In what respect is the poll tax or the payment of poll tax a qualification to vote * * *?

Nor can the poll tax be defended on the ground that it provides a legitimate method of raising money for public education or other lawful purposes. The State itself does not regard the poll tax in this light. The tax is not zealously enforced like other tax measures—the State has no legal authority to collect the tax if a person chooses not to vote. Moreover, even if the State—in this area—had a legitimate interest in raising revenue by taxation, this does not mean that it is justified in this method of collection.

The imposition of a poll tax impedes and deters the exercise of the franchise rather than promotes any legitimate state interest by making its exercise costly. Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177 (1965). Just as the imposition of a tax to attend church, or a tax on the right to stand up and voice one's views on the events of the day would be unconstitutional regulations, so too is a similar imposition on the right to vote.[7] In short, financial ability has no place in a test of voting eligibility and is irrelevant to a determination of who is qualified to vote.

For these reasons, the poll tax as a license tax on voting is violative of the due process clause of the Fourteenth Amendment and is therefore constitutionally invalid.

GEWIN, Circuit Judge (dissenting):

I would readily join in the issuance of an injunctive decree removing and prohibiting every vestige of racially discriminatory or other unconstitutional application of Alabama's poll tax laws, but I cannot join in the opinions of the majority. In my view it is unusual, to say the least, for a district court to declare constitutional and statutory provisions of a state invalid when the last pronouncement by the Supreme Court on the subject holds to the contrary. The impropriety of the action of the majority is brought into sharper focus by the fact that substantially identical issues were submitted to the Supreme Court in the case of Harper v. Virginia State Board

---

"MR. GARRETT: Well, it shows an interest in the electoral system, it shows that they have got enough interest to mail it to the Tax Collector or go down to his office and pay it, it shows—it is a—sort of rough intelligence test, it is sort of a rough one, it is real rough. * * * *"

I do not think so. I am in agreement with the Court in United States v. Texas, supra:

"* * * * The ignorant and incompetent spouse, parent or child may vote if some member of his family remembers to purchase a poll tax for him. Anyone who becomes 21 years old after the beginning of the tax year but before the election or who is over 60 years old may vote without paying a poll tax fee or without showing the intelligence or competence necessary to accumulate $1.75 in one year. Thus, it is obvious that the poll tax in Texas is not a 'test' of the intelligence or the competence of potential voters." (Footnotes omitted.)

7. In Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942), the Court sustained a municipal ordinance which exacted a fee for the privilege of distributing tracts or other printed materials on public streets. A year later the judgment was vacated, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943), and the ordinance held invalid on the strength of Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), which upset a similar Pennsylvania requirement. Follet v. Town of McCormick, 321 U.S. 573, 64 S. Ct. 717, 88 L.Ed. 938 (1944), annulled a South Carolina ordinance similar to that in the Murdock case. The lesson to be gleaned from these cases is clear: "The exaction of a tax as a condition to the exercise of the great liberties guaranteed by the First Amendment is as obnoxious [citing Grosjean v. American Press Co., 297 U.S. 233, 516 S.Ct. 444, 80 L.Ed. 660 (1936) and Murdock, supra] as the imposition of a censorship or a previous restraint. Near v. [State of] Minnesota [ex rel. Olson], 283 U.S. 697, [51 S.Ct. 625, 75 L.Ed. 1357]. For, to repeat, 'the power to tax the exercise of a privilege is the power to control or suppress its enjoyment.' Murdock v. [Commonwealth of] Pennsylvania, supra, [319 U.S.] p. 112 [63 S.Ct. page 874]." Follet v. Town of McCormick, supra, 321 U.S. at 577, 64 S.Ct. at 719.

of Elections [1] approximately three weeks before this case was submitted to this district court. I am aware of the statute requiring speedy consideration of poll tax cases.[2] It is assumed that the Supreme Court feels the same urgency and attaches the same importance to the litigation as does this district court.

The *Harper* case now pending before the Supreme Court involves an annual poll tax in the amount of $1.50 in non-federal elections imposed by the laws of Virginia. Arguments presented to the Supreme Court were similar to those presented to this Court. See 34 U.S. L.Week 3261 (February 1, 1966). The principle of judicial restraint dictates that we await the action of the Supreme Court.

The poll tax has never been declared invalid by the Supreme Court. It has uniformly been considered that the case of Breedlove v. Suttles, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252 (1937) is the final word to-date on the question of the validity of state imposed poll taxes in non-federal elections.[3] As succinctly stated by the three judge district court of Virginia when the *Harper* case was before it:

"Notwithstanding the plaintiffs' impoverishment and eligibility to vote, their denunciation of the State constitutional and statutory poll tax requirements has been squarely refuted by the Supreme Court in Breedlove v. Suttles, 302 U.S. 277, 283, 58 S.Ct. 205, 82 L.Ed. 252· (1937). We are not at liberty to deviate from that precept. There

the Court considered arguments akin to those of the plaintiffs here, including the economic factor, and rejected them."

Harper v. Virginia State Board of Elections, 240 F.Supp. 270, 271 (1964).

When *Harper* was argued before the Supreme Court, Mr. Justice Clark posed the following question:

*Mr. Justice Clark*: "What do you do with the Breedlove case?"

Counsel for the appellant Harper replied:

"Breedlove has lost all meaning and significance in light of recent decisions of this Court. *Breedlove should be overruled.*" (Emphasis added)

Mr. Justice White asked substantially the same question of the Solicitor General of the United States:

*Mr. Justice White*: "What about Breedlove?"

The Solicitor General is reported to have responded to the effect that the *Breedlove* case was contra to the position of the Government. 34 U.S.L.Week 3262. It is obvious that the decision in *Breedlove* is binding on this Court and is dispositive of the issues before us. We should follow the decisions of the Supreme Court and not seek to anticipate what future rulings may be, especially in cases involving the validity of a state constitutional provision. Such has always been the law of the Fifth Circuit. Judge Rives, speaking for the Court en banc, succinctly stated the rule in How-

---

1. The decision of the District Court in *Harper* is reported in 240 F.Supp. 270 (1964).

2. Title 42 U.S.C.A. § 1973h(c).
   "Jurisdiction of three-judge district courts; appeal to Supreme Court
   (c) The district courts of the United States shall have jurisdiction of such actions which shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall

lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited."

3. The 24th Amendment to the Constitution abolished state imposed poll taxes in federal elections. See Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

ard v. United States, 232 F.2d 274, 275 (1956):

"This Circuit follows the law as stated by the Supreme Court and leaves any need for modification thereof to that Court * * *."

The *Breedlove* case reached the Supreme Court by Appeal from a decision of the Supreme Court of Georgia,[4] holding valid the provisions of the Constitution of Georgia and statutes enacted in pursuance thereof requiring the payment of a poll tax as a prerequisite to the right to register and vote for candidates seeking the office of President and Members of Congress. The Georgia decision carefully delineates the issues presented. The poll tax was attacked on every possible constitutional ground. Breedlove, the petitioner, alleged that the Georgia poll tax was contrary to and in derogation of the following provisions of the Constitution: (a) The Preamble; (b) Article IV, Section 4, guaranteeing to every state a republican form of government; (c) Article I, Section 8, Clause 1 relating to uniform tax; (d) Article I, Section 9, Clause 4 which prohibits the laying of a capitation or other direct tax unless it is in proportion to the census; (e) Article IV, Section 2, Clause 1 declaring that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states; (f) Article VI, Clause 2 declaring the Federal Constitution to be the supreme law of the land; (g) the following provisions of the Fourteenth Amendment: (1) the privileges and immunities provision; (2) the due process clause, "and the clause in said amendment which defines the word 'liberty'"; (h) the Fifteenth Amendment establishing and guaranteeing certain rights of citizens without regard to race, color or previous condition of servitude, including the right to vote; (i) the Nineteenth Amendment prohibiting laws denying or abridging the right of citizens to vote on account of sex;

(j) the First amendment relating to rights of conscience and the right to petition the government for redress of grievances. In addition to all of the foregoing, it was claimed that the poll tax violated the Constitution of the State of Georgia. Both the Georgia Supreme Court and the Supreme Court of the United States rejected all of Breedlove's contentions and held the tax valid. It is difficult to see how that decision can be termed inapposite, or can be classified as dictum with respect to the issues now before us. There are other cases sustaining the poll tax, but I believe Breedlove to be the nearest in point and that a discussion of other decisions is not necessary. Accordingly, I do not reach the merits of this case for the reasons stated, but it is necessary to refer to the majority opinions which do discuss the merits.

It is not good and proper to delve into the tragic shadows of history following Reconstruction and the reactions it created and use the emotional statements of politicians uttered in public debate over a half century ago in a convention hall to decide the constitutionality of Alabama's present basic poll tax law adopted in the year 1953 and subsequently amended in the year 1962. There is much in the history of all of the states, and indeed the nation itself, with which we do not agree. It is easy to find statements from the past which do not fit the present. As an example, for those who may be interested, there are statements by Abraham Lincoln, the Great Emancipator, which do not square with present day constitutional concepts. Some statements by Lincoln make some of the statements referred to by delegates to Alabama's Constitutional Convention appear temperate and mild by comparison. I refrain from quoting such statements because I think they would be misunderstood in the context of this opinion. However, their source is cited for those who may be interested enough to read them. See "The

4. Breedlove v. Suttles, 183 Ga. 189, 188 S.E. 140 (1936).

Collected Works of Abraham Lincoln" (Basler ed.) Rutger's University Press (1953), Vol. III, page 16 (August 21, 1858), pages 146–7 (September 18, 1858). See also Douglas, "An Almanac of Liberty" (Doubleday 1954), page 29.

Indeed, our own Federal Constitution as originally adopted was infected with the idea of discrimination as evidenced by Article I, Section 2, Clause 3:

"Clause 3. Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of *free Persons*, including those bound to Service for a Term of Years, and *excluding Indians* not taxed, *three fifths of all other Persons*." (Emphasis added)

It was necessary to enact the Fourteenth Amendment to change the mode of apportionment of representatives among the several states, and the Sixteenth Amendment as to taxes on incomes without apportionment.

Unquestionably, some of the delegates to the Alabama Constitutional Convention possessed a motive of discrimination against Negroes, but Alabama too has completely changed its Constitution. It did so by a basic change in 1953. Again, I reiterate what I said in the beginning. Racially discriminatory or other unconstitutional application of Alabama's poll tax should be enjoined wherever it appears; and this principle applies to the Chief Executive and all the officers and agents of the State with equal force. Nothing herein said is intended to constitute a condonation or approval of any racially discriminatory acts, certainly not the brochure recently distributed by the Chief Executive of this State.

I respectfully dissent.